# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

**FAROOQ A. ALEEM,**

**Petitioner,**

v.

**DERRAL G. ADAMS, Warden,**

**Respondent**

No. _____

**PETITION FOR WRIT OF HABEAS CORPUS (28 U.S.C. section 2254)**

Mark D. Greenberg
Attorney at Law
Cal. SBN 99726
484 Lake Park Avenue, No. 429
Oakland, CA  94610
(510) 452-3126

Attorney for Farooq A. Aleem, V74629
Corcoran State Prison
P.O. Box 3481
Corcoran, CA  93212

# TABLE OF CONTENTS

**PETITION FOR A WRIT OF HABEAS CORPUS**                    1

**PRELIMINARAY ALLEGATIONS (I-III)**                    1

**SUMMARY OF EVIDENCE PRESENTED AT TRIAL (IV)**        4

**CLAIMS FOR RELIEF (V)**                    11

    **A.  Trial counsel rendered ineffective assistance of counsel by failing to object to inadmissible hearsay, which failure resulted in the conviction of petitioner on four counts.**                    11

    **B.  Petitioner was denied the protection of the Due Process Clause of the Fourteenth Amendment because the one-strike findings in connection with counts 17 and 18 were not based on substantial evidence of the use of physical force to move Jane Doe 2.**                    14

    **C.  The finding of one-strike kidnapping enhancements in connection with counts 17 and 18 were also in violation of the Due Process Clause of the Fourteenth Amendment because of insufficient evidence that the movement of Doe 2 substantially increased the risk of harm to her.**                    16

    **D.  Petitioner's conviction for aggravated kidnapping to commit oral copulation, as charged in count 6, is in violation of the Due Process Clause of the Fourteenth Amendment because of insufficient evidence that the movement of Doe 1 substantially increased the risk of harm to her.**                    16

**EXHAUSTION ALLEGATION (VI)**                    17

**PRAYER FOR RELIEF**                    18

i

**VERIFICATION**      19

**TABLE OF AUTHORITIES**

**Cases**

*Apprendi* v. *New Jersey*, 530 U.S. 466 (2000)      15,16

*In re Cheryl H.,* 153 Cal.App.3rd 1098 (1984)      13

*In re Winship,* 397 U.S. 358 (1970)      14,17

*Jackson* v. *Virginia*, 443 U.S. 307 (1979)      15,16,17

*Johnson* v. *Aetna Life Ins. Co.*, 221 Cal.App.2nd 247 (1963)      13

*People* v. *Daniels*, 71 Cal.2nd 1119 (1969)      16

*People* v. *James*, 196 Cal.app.3rd 272 (1987)      13

*People* v. *Johnson*, 3 Cal.4th 1183 (1992)      13

*People* v. *Jones*, 108 Cal.App.4th 455 (2003)      15

*People* v. *Moreno*, 188 Cal.App.3rd 1179 (1987)      14

*People* v. *Rayford*, 9 Cal.4th 1 (1994)      16

*Strickland* v. *Washington*, 466 U.S. 688 (1984)      11,13,14

1  Mark D. Greenberg
2  Attorney at Law
   Cal. SBN 99726
3  484 Lake Park Ave., No. 429
4  Oakland, CA  94610
   (510) 452-3126
5
6  Attorney for Petitioner
   Farooq A. Aleem, V74629
7  Corcoran State Prison
   P.O. Box 3481
8  Corcoran, CA  93212
9
10
11
                 **UNITED STATES DISTRICT COURT**
12
                **NORTHERN DISTRICT OF CALIFORNIA**
13

14  **FAROOQ A. ALEEM,**                    **No. _____**
15              **Petitioner,**
16        **v.**                            **PETITION FOR WRIT OF HABEAS**
                                            **CORPUS (28 U.S.C. section 2254)**
17  **DERRAL G. ADAMS, Warden,**
18              **Respondent**
19
20

21
22      Petitioner, through his counsel, files this petition pursuant to 28 U.S.C. section
23  2254 *et seq.*, and alleges as follows:
24
                                  **I.**
25
26      Petitioner is currently confined at Corcoran State Prison, Corcoran, California.
27
28

                                  1

## II.

**A.**  In an amended information filed on October 27, 2004 (CT 434-444), the District Attorney of San Mateo County accused petitioner in counts 1 to 14 of crimes against Jane Doe 1 as follows:  count 1, false imprisonment (§ 237)[1]; count 2, contributing to the delinquency of a minor, a misdemeanor (§ 272(a)(1)); count 3, attempted sexual battery (§§ 664, 243.4(a)); counts 4 and 7, forcible oral copulation (§ 288a(c)(2)); counts 5, 9, and 13, criminal threats (§ 422); count 6, kidnap to commit forcible oral copulation (§ 209(b)(1)); count 8, witness dissuasion (§ 136.1(c)(1)); count 10, forcible penetration by a foreign object (Pen. Code, § 289()(1)); count 11, attempted rape (§§ 664, 261(a)(2); count 12, misdemeanor batter (§ 242); and count 14, sexual battery (§ 243.4(a)).  A one-strike life-term enhancement was alleged for count 7 based on kidnapping.  (§ 667.61, subds. (d)(2), (e)(1)).

**B.**  Counts 16 through 19 alleged Jane Doe 2 as a victim as follows:  count 16, forcible penetration by a foreign object (§ 289(a)(1)); counts 17 and 18, forcible oral copulation (§288a(c)(2)); and count 19, criminal threats (§ 422).  The one strike enhancement for kidnapping was attached also to counts 16, 17, and 18.

**C.**  Counts 20 through 23 involved Jane Doe 3 and were charged as follows:  count 20, kidnap to commit rape (§ 209(b)(1); count 21, assault with intent to commit oral copulation (§ 220); count 22, assault with a deadly weapon (§ 245(a)(1)); and count 23, forcible oral copulation (§ 288a(c)(2)).  An enhancement for personal knife use (§ 12022(b)) was alleged in connection with count 20.

**D.**  Petitioner was found guilty by a jury of counts 1, 2, and 4, count 6 through 10, counts 12 through 15, and counts 17 and 18.  The one-strike allegations for counts 7, 17 and 18 were found true.  Petitioner was acquitted on count 20.  On all other counts, a mistrial was declared because the jury was unable to arrive at a unanimous decision.  (CT 609-611.)

---

[1]  Unless otherwise indicated, all code reference are to the California Penal Code.

**E.**  On March 1, 2005, petitioner was sentenced to an indeterminate term of 65 years to life under the one-strike law, consisting of two consecutive 25 years to life terms (counts 17 and 18) and one 15 years to life term (count 7).  A determinate term of 16 years was imposed consecutively for the remaining counts.  (CT 937-939.)

**F.**  Petitioner pursued a direct appeal to the California Court of Appeal, First Appellate District in case number A109515.  On August 25, 2006, while appeal was still pending, petitioner filed a habeas corpus petition in the same court as case number A115017.  On November 17, 2006, the Court of Appeal affirmed petitioner's convictions on appeal and issued an order denying his petition for a writ of habeas corpus.

**G.**  On December 29, 2006, petitioner filed petitions for review in the California Supreme Court.  The petition for review from the appeal was given case number S149176.  The petition for review of the denial of the writ of habeas corpus was given case number S149155.  On March 14, 2007, both petitions were denied.

### III.

The federal issues presented to the California Court of Appeals and the California Supreme Court were as follows:  **A.)**  Petitioner was denied his right under the Sixth Amendment of the United States Constitution to effective assistance of counsel because of trial counsel's prejudicial failure to object to inadmissible hearsay evidence; **B.)**  Petitioner was denied his right under the Due Process Clause of the Fourteenth Amendment by a conviction for the one-strike enhancement allegations in connection with counts 17 and 18 because there was insufficient evidence of the use of physical force;  **C.)**  Petitioner was denied his right under the Due Process Clause of the Fourteenth Amendment by a conviction for the one-strike enhancement allegations in connection with counts 17 and 18 because there was insufficient evidence of a substantial increase in the risk of harm;  **D.)**  Petitioner was denied his right under the

3

Due Process Clause of the Fourteenth Amendment by his conviction on count 6 because there was insufficient evidence of a substantial increase in the risk of harm.

**IV.**

The following is a summary of the evidence presented at petitioner's state court trial:

**Jane Doe 2:**

Around midnight on December 18, 2002, Jane Doe 2, 18, was waiting for a bus at Bayshore and Cortland in San Francisco, when Petitioner approached and began talking with her. (RT 79, 83-84, 121.) He offered to give her a ride home and she agreed. (RT 86.) She was about one mile or twenty-minute walk from home. (RT 174-175.) She got in Petitioner's car; Petitioner's brother was also a passenger. (RT 87-88.) Petitioner headed towards her house and then made a U-turn. She said she wanted to go home. He said they were going to a party "for a little bit." (RT 90.) As she told the police, she agreed to go to the party. (RT 184, 187-189.) He offered her marijuana and alcohol, which she refused. (RT 93.)

They crossed the Bay Bridge and she became afraid, repeating that she wanted to go home. (RT 94.) Petitioner was very flattering: he told that she was pretty and smart. She told the police that she was "swayed" by what he said. (RT 91, 95, 193.) Petitioner drove to Fairfield. He told her that he would take her home after they went to a party for a little bit. (RT 96-97.) They eventually arrived at a house. She followed Petitioner in. (RT 99, 198-199.) Two people were inside playing video games. Otherwise, there was no party. (RT 101-102.) Doe sat down. Petitioner left the room for a while. Doe did not attempt to call anyone about her situation, even though she had her cell phone. (RT 200-201.) Petitioner returned and told her to follow him to the bathroom. (RT 104.) Petitioner said this in a calm, polite, and friendly way. He was not threatening. (RT 203.) When she hesitated, he sounded more stern, but not threatening. (RT 105, 203.) But Doe also testified that when she

4

told Petitioner she did not want to go to the bathroom, he said, "Don't think that I won't hurt you," which made Doe 2 afraid. (RT 116-117, 208, 355.) She knew he wanted to have sex, she went to the bathroom with him anyway. (RT 204.)

Once inside the bathroom, he spoke nicely to her, saying she was pretty. (RT 206-207.) In a calm voice, he asked her to remove her clothing. He did not threaten her. She said no. (RT 208-209.) He removed her jacket, shirt, bra, pants, and underpants. She tried to resist. He told her to stop moving. But in several statements to the police, she never said that Petitioner pulled down her pants. (RT 106, 108-109, 211-212.) Petitioner did not threaten her to get undressed. The most he said was "let go of your jacket." (RT 210.) He told her to "suck his dick." (RT 110.) She said "no" several times. He took out his penis and pulled the back of her head towards it. She tried to resist. She orally copulated him for less than a minute. (RT 112-114.) She did not cry or yell. (RT 219.) But she gave a different account to the police. She did not say that Petitioner forced her. She said he "asked" her several times to orally copulate him. He did not demand it. She did not tell the police that he "forced her." (RT 340-341.) She said only that after he touched her head she felt how strong he was and decided to comply. She decided to do it because he was so strong. (RT 217, 341.) She described Petitioner as 5'10" and 230 pounds. (RT 280.) She also told the police that Petitioner "asked" her to continue to orally copulate him, not that he forced her to. (RT 219.) He told her to do it again. She said no. He told her to do it several times. She again orally copulated him for less than a minute. (RT 115-116.) Both times, she tried to resist. (RT 114-115.) She did not cry. (RT 342.)

Petitioner left the bathroom. Doe 2 stayed in it. Petitioner's brother knocked on the door. He asked for sex. Doe said no and asked him to take her home. He said he was sorry and seemed nice. (RT 120-121.) Doe admitted that she could have called 911 or anyone else after Petitioner left the bathroom, but she did not. (RT 222.) A while later, Petitioner said, "Let's go." She did not want to go with him. He again became stern. (RT 127.) They drove back to San Francisco, this time without

5

Petitioner's brother.  (RT 127, 129.)  Doe admitted that she could have run from Petitioner, but that she voluntarily got in the car with him.  (RT 229-230.)  During the car ride, Petitioner tried without success to have her orally copulate him again.  (RT 132-133.)

He drove to the highest parking lot in Twin Peaks.  (RT 136.)  She was afraid for her life.  (RT 137.)  Petitioner told her to take off her clothes.  He did not yell at her to take them off; there was a lot of talking back and forth.  (RT 346.)  He again told her to suck his dick.  When she said no, he said he had a gun and threatened to use it.  She never saw a gun.  (RT 138-139.)  Doe, however, said nothing about a gun in her written statement to the police.  (RT 236.)  She again briefly orally copulated him.  He told her to continue and pushed her back down.  (RT 140.)  He inserted his finger in her vagina.  (RT 145-146.)  Another car arrived and he stopped.  (RT 141.)

He then drove to Bernal Heights and parked in a residential neighborhood.  He told her to orally copulate him and that he would take her home in a minute.  He forced her head down on his penis.  He ejaculated.  He again inserted his finger in her vagina.  (RT 145-146.)  He took her home and returned her wallet and cell phone.  He asked for her cell phone number, which she gave him.  (RT 147-149.)  He said "I'll call you," in a non-threatening way.  (RT 237.)  He called several times; she answered the first time he called.  (RT 155.)  She reported the incident to the police about one month later, at the urging of a friend.  (RT 153.)

Doe admitted that she had numerous opportunities to get help: she could have run when she got out of the car and into the car at Fairfield, at the tollbooth, and at Twin Peaks when other cars pulled in.  She also conceded that she could have called 911 on several occasions.  (RT 248-249.)

In her statements to police, Doe 2 said that before she went into the bathroom in the Fairfield residence, Petitioner told her he would track her down and hurt her.  (RT 271.)  She also told  them she was afraid to defend herself because of Petitioner's size.  (RT 274-275.)  She did not tell the police that he offered her marijuana.  (RT 265.)

She also said that at some point Petitioner called her a whore and said she wanted it. Over the course of the evening she was afraid and just stopped thinking. (RT 310-311.)

She told police that her initial conversation with Petitioner in the car was very comfortable and Petitioner was sweet-talking her. (RT 332.) She did not ask him to take her home while they drove to Fairfield. (RT 333.) In addition, Petitioner entered the house before she did. (RT 334.) They talked in the bathroom for fifteen minutes. Then Petitioner asked her to remove her clothes. When he told her to let go of her jacket, his voice was deep and threatening. (RT 337.) She was scared he might hurt her. (RT 339.)

Petitioner was renting a residence in Fairfield at 746 North Texas Street. The police searched it and found a small crop of marijuana growing in a bedroom. (RT 296-298.) A medical marijuana document was found at the house. (RT 322.)

**Jane Doe 1:**

On January 14, 2003, Jane Doe 1, 17, was waiting for a bus at the BART station in Balboa Park. Petitioner was standing near his car. There was a male passenger in it. (RT 371-372.) Petitioner asked her if she wanted to hang out for a while and smoke dope. (RT 370-372, 375.) She agreed and got in the back of his car. (RT 376.) She also told him her age and her first name. (RT 373, 375.) Petitioner said that he would eventually take her home. (RT 378.) She admitted that she got in the car voluntarily. (RT 439.) She was already high from having smoked marijuana earlier. (RT 440.)

The three of them drove around the Glen Park Station area for about an hour, smoking marijuana and ingesting cocaine. (RT 379-381.) Because of the drugs, she was confused and could not remember "most of everything" that happened. (RT 442, 467.)

Petitioner drove to a motel on Geneva in Daly City. Doe asked what they were doing there. He said, "We're going to chill for a minute." (RT 384.) Petitioner and

7

his friend walked in front of her to a motel.  She was beginning to become afraid.  (RT 387.)

She sat on the bed while the other male watched television.  Petitioner nonviolently pushed her into a lying position and touched her vagina for one to two minutes.  She did not object to this touching.  He told her to take a shower, which she did voluntarily.  (RT 455.)  He entered the bathroom while she was undressed and rubbed his penis against her for about a minute.  (RT 392-393.)  She did not tell him to stop.  (RT 457.)  She did not tell the police he rubbed his penis against her.  (RT 665-666.)  She did not remember an act of oral copulation in the bathroom or telling the police about one.  (RT 398.)  He let her put her shirt on; he took the rest of her clothes and put them under the bed.  (RT 395-396.)  She wanted to get completely dressed and he finally allowed her to.  (RT 397.)  She said she was leaving and walked towards the door.  He said, "If you walk out that door, I'm going to fuck you up."  This scared her and she sat down.  (RT 400.)

The three left the hotel room.  While Petitioner was returning the key, Doe tried to leave.  Petitioner grabbed her arm and did not let her leave.  (RT 401.)  They got in the car and left.  She asked to go home.  Petitioner said, "You need to finish what you started."  (RT 404.)  They drove to Diamond Heights.  On the way, Petitioner's friend tried to touch her.  She would not let him.  He slapped her in the face.  (RT 404-405.)  It did not leave a mark.  (RT 465.)  Petitioner's friend said, "You shouldn't be acting like this because something bad is going to happen to you."  (RT 405.)

Petitioner parked in Diamond Heights.  She was "really scared."  She saw no other people in the area.  (RT 405.)  He told her she had to "suck him up and swallow his come."  (RT 407.)  She said no.  He said "you better."  (RT 408.)  He pushed her head down onto his penis.  He touched her vagina with his hand but she did not know if he penetrated her.  (RT 409-410.)  At some point he slapped her head but she could not remember when.  He ejaculated in her mouth.  (RT 411.)

8

He dropped her off at a gas station and told her that he would hurt her if she told anyone.  He wrote down his phone number and the name "papa," and told her to call him.  (RT 412, 458.)

Her mother made her call the police when she got home.  (RT 415.)  She told the police that the sex acts with Petitioner did not bother her; what bothered her was the threat: "I really wouldn't have tripped over it if he wouldn't of threatened me."  (RT 686; see RT 460.)

Doe 1 tested positive for cocaine metabolite and marijuana.  (RT 799.)

Vapas Sheth, managed the Geneva motel on Geneva Avenue in Daly City.  The police visited him on January 15, 2003, regarding Doe 1.  (RT 417.)  His records showed that a "Farooq Abdul Petitioner" rented a room on January 14, 2003.  Petitioner filled out a registration card with his correct identifying information.  (RT 419.)  Two days later, Petitioner returned with a female and tried to check in again.  (RT 430.)  Vapas recognized his name and called the police.  (RT 425.)  Petitioner was cooperative when he was arrested.  He had a baggie of marijuana and an altered cigarette that contained .02 grams of cocaine, a barely usable amount, in his possession.  (RT 653, 724.)

Kris Bleything, a nurse practitioner, examined Doe 1 on January 15, 2003.  She observed some ruptured capillaries on the roof of Doe's mouth and redness on the tonsil area.  These injuries were consistent with a blunt force hitting Doe's throat.  Bleything has seen such injuries before in other cases of forcible oral copulation.  (RT 502-505.)  She conceded that the throat injuries could have been caused by other things such as smoking marijuana.  (RT 525.)

She also observed a possible very small laceration inside the labia minora and some redness in the fossa fourchette area below the entrance to the vagina.  (RT 508, 527.)  These injuries were consistent with Doe's report of forcible digital penetration.  (RT 510-511.)  Bleything did not observe any injuries suggesting that Doe had been slapped.  (RT 522.)

9

The police had Doe 1 call Petitioner.  The first call did not go well.  The police had her call again.  Petitioner called back and agreed to see her, but made no admissions.  (RT 644-645.)

Petitioner's car was tested for semen; none was found.  (RT 798.)

**Defense Case**

Tobenna Okobi, 23, is Petitioner's brother.  He was the passenger when Petitioner met Doe 2 and drove her to Fairfield.  (RT 802-803, 805.)  They had just purchased a laptop for music production and were heading for the Fairfield residence, which they used as a recording studio.  (RT 805.)  On the way, they stopped at a store for drinks.  Petitioner returned to the car with Doe 2.  She said "hi" and got in the back.  (RT 806-808.)  Doe did not seem alarmed on the way to Fairfield.  She asked to smoke marijuana that Petitioner had mentioned.  They smoked.  (RT 811.)

When they arrived, three friends were playing video games.  (RT 814.)  She asked Okobi to show her the recording area.  As it turned out, both of them went to City College of San Francisco.  (RT 817-818.)  She gave him her home number and cell phone number.  He called her a day or two later.  (RT 828-829.)

While he was showing her the studio, Petitioner came back and said it was time to leave.  (RT 819-820.)  They were there with Doe 2 for only 20 minutes.  (RT 852, 867.)  However, Okobi told Petitioner's investigator that they were there for about forty-five minutes.  (RT 995.)

Okobi never noticed Doe 2 in one of the bathrooms and never asked her for sex.  (RT 826, 829.)  She did not say she wanted to go home.  (RT 861.)  Okobi did not remember Petitioner picking up a second woman.  (RT 912.)

Donshae Bethea, 23, is Okobi's friend and a member of his music group.  (RT 918-919.)  He was present at the Fairfield studio on one occasion when Petitioner brought by an Asian woman.  He was there with two other friends playing video games.  Petitioner and Okobi came in with the woman and with some music equipment.  (RT 921-922.)  Petitioner and the woman were not there for more than ten

10

to twenty minutes.  (RT 932.)  Petitioner stayed in the entertainment room the entire time, joking and watching video games.  (RT 941-942.)

There is a doughnut shop, Winchell's, right across the street and 70 yards from the Fairfield residence.  It is open 24 hours a day and is visible from the Fairfield residence.  (RT 920, 975-976.)

**V.**

**CLAIMS FOR RELIEF**

**A.  Trial counsel rendered ineffective assistance of counsel by failing to object to inadmissible hearsay, which failure resulted in the conviction of petitioner on four counts.**

1.  At trial, Jane Doe 1 had no memory of the forcible oral copulation (count 4), the forcible penetration by a foreign object (count 10), criminal threats (count 13) and sexual battery (count 14).  The primary evidence of these crimes was her out-of-court statements to Detective Mangan and to nurse practitioner Kris Bleything, which were introduced into evidence without any hearsay objection lodged by defense counsel, although there was no hearsay exception allowing for the admissibility of these statements.  The failure to object and thereby prevent the admission of the only incriminating evidence there was on these counts constituted a denial of petitioner's right to effective assistance of counsel as guaranteed by the Sixth Amendment of the United States Constitution.  (*Strickland* v. *Washington*, 466 U.S. 688 (1984).)

2.  On January 15, 2003, the day after the incident, Doe 1 was interviewed by Detective Mangan, the tape of which interview was played to the jury.  (RT 633-634.)  Also on January 15, 2003, Doe 1 was examined by nurse practitioner Kris Bleything, who testified, without objection by defense counsel, to Doe 1's statements about the incident.  (RT 492.)

3.  According to the prosecutor, count 4 was based on the act of oral copulation allegedly taking place in the bathroom at the Geneva Motel.  (RT 1075.)  At trial, Doe remembered nothing about the incident and the attempt to refresh her memory by use

11

of the transcript of her interview with Detective Mangan failed.  (RT 398-399.)  The tape played for the jurors revealed Doe 1 relating to Mangan that petitioner had made her orally copulate him in the motel bathroom.  (CT 538-540.)  According to Mangan, she also mentioned this shortly before the interview and about 10 days later when Mangan recontacted her.  (RT 623-624, 666.)  Bleything also testified that Doe I told her that petitioner forced Doe I to orally copulate him in the motel bathroom.  (RT 492.)

4.  In regard to count 10, Doe 1 testified that petitioner touched her vagina, but she could not remember if he penetrated her with his finger.  (RT 410.)  During the interview with Mangan, Doe I related that petitioner inserted his finger into her vagina when they were parked in Diamond Heights.  (CT 564-568.)  Bleything testified to Doe I's statements that petitioner inserted his finger in Doe I's vagina around the time petitioner made Doe I orally copulate him in his car in Diamond Heights.  (RT 492.)

5.  According to the prosecutor, count 13, criminal threats, occurred  when petitioner was trying to make Doe 1 orally copulate him, and told her that if she did not stop resisting, he would beat her.  (RT 1095.)  Doe 1 did not testify that petitioner made such a statement or anything like it.  She testified only that when she refused to orally copulate him, petitioner replied, "You better."  (RT 408.)  Only in her interview with Mangan did Doe 1 impute to petitioner a threat to beat her if she refused to orally copulate him.  (CT 553.)

6.  According to the prosecutor, count 14, sexual battery, occurred with petitioner removed Doe 1's clothes on the motel room bed and touched her breasts against her will.  (RT 1092.)  Doe 1 testified that while she was on the bed, petitioner touched her over her clothing, that she did not object to this touching, and that she did not tell him to stop or to take his hand away.  (RT 389-391, 455, 457.)  To Mangan, Doe 1 stated that she allowed petitioner to touch her over her clothes, but then  he went too far by removing her shirt, bra, and pants, and then started touching her body, including her breasts.  (CT 531-537.)

7.  The statements of Doe 1 to Detective Mangan were inadmissible hearsay under California law.  The prosecutor explained to the jurors that the taped statement was admissible for the truth of the matters asserted because they represented prior inconsistent statements of Jane Doe 1.  (RT 1075-1076, 1080-1081.)  However, under California law, a witness's inability to remember an even does not provide the requisite foundation for the admission of extrajudicial statements under this hearsay exception unless the claim of lack of memory amounts to a deliberate evasion of the questions asked, and an inconsistency is therefore implied.  (*People* v. *Johnson*, 3 Cal.4th 1183, 1219 (1992).)  Here, Doe 1, the complaining witness in this case, who was otherwise supplying incriminating evidence for the prosecution, was clearly not being evasive or false about her lack of memory as recounted in the previous paragraphs.  The prosecutor himself did not question or doubt her inability to remember.  (RT 1075; see also RT 1080-1081.)  Thus, Doe 1's statements were inadmissible under California law and a timely objection would have prevented their admission.

8.  In regard to Bleything, the statements made by a patient to a physician regarding the cause of an injury are not admissible for the purpose of establishing the truth of the facts contained therein.  (*People* v. *James*, 196 Cal.app.3rd 272, 287 (1987); *In re Cheryl H.,* 153 Cal.App.3rd 1098 (1984); *Johnson* v. *Aetna Life Ins. Co.*, 221 Cal.App.2nd 247, 252 (1963).)  A timely objection and at least a request for a limiting instruction would have prevented the use of this evidence for the truth of the matter asserted.

9.  Under clearly established law established by the Supreme Court of the United States, a criminal defendant has a right under the Sixth Amendment to effective assistance of counsel, which right is denied when counsel's representation falls below an objective standard of reasonable under prevailing professional norms, and, secondly, when these failings and deficiencies subject the defendant to prejudice. (*Strickland* v. *Washington*, *supra*, 466 U.S. 668, 687.)

13

10.  Failure to object to inadmissible hearsay that redounds to no benefit whatsoever to the defense falls below objective professional norms.  (*People* v. *Moreno*, 188 Cal.App.3rd 1179, 1190-1191 (1987).)  Trial counsel's failure in the instant case was therefore incompetent.

11.  In regard to counts 10, 13, and 14, the *only* evidence presented to the jurors were the hearsay statements that should have been excluded or limited.  Without this evidence there was no evidence whatsoever to support a conviction for these counts.

12.  In regard to count 4, however, there was further evidence in addition to the inadmissible hearsay statements.  After Doe 1 returned home, her mother made her call 911.  During the conversation with the dispatcher, Doe 1 reported one offense:  an oral copulation in the motel bathroom.  (CT 494, 499.)  Doe 1's statement to the dispatcher was admitted into evidence as a spontaneous statement.  (RT 12, 479-480; CT 492 *et seq.*)  However, at the time of the call, Doe 1 was under the influence of cocaine and marijuana, and her reference to the oral copulation lacked very little circumstantial detail and was fleeting.  She was unable to remember the incident at all at trial even after her memory was refreshed by reference to her interview with Detective Mangan.  If the only evidence presented to the jurors on count 4 was the 911 call, there was nonetheless a reasonable probability that the result of the proceeding would have been different on count 4 even in the face of the 911 evidence.  (*Strickland* v. *Washington*, *supra*, 466 U.S. at p. 694.)

**B.  Petitioner was denied the protection of the Due Process Clause of the Fourteenth Amendment because the one-strike findings in connection with counts 17 and 18 were not based on substantial evidence of the use of physical force to move Jane Doe 2.**

1.  By clearly established federal law, a conviction based on less than substantial evidence violates a defendant's right to due process of the law as guaranteed by the Due Process Clause of the Fourteenth Amendment.  (*In re Winship,* 397 U.S. 358, 362-364 (1970).)  The same guarantee applies to penalty allegations, the finding of which

14

raise the punishment beyond the maximum otherwise allowed.  (*Apprendi* v. *New Jersey*, 530 U.S. 466 (2000).)  In the instant case, the jury's true-finding of enhancement allegations under the one-strike law in connection with counts 17 and 18 were not supported by substantial evidence of the use of force to move Jane Doe 2.

2.  The special allegation that rendered petitioner punishable by life terms for counts 17 and 18 was that he had kidnapped Jane Doe 2 in the course of and as part of the commission of the charged crimes in these counts.

3.  Under California law, kidnapping is defined as follows:  "Every person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping."  (§ 207(a).)  Although the crime can be committed by the use either of force or the instilling of fear (*People* v. *Jones*, 108 Cal.App.4th 455, 462 (2003)), the jurors in the instant case were instructed only on kidnapping by the use of force.  (CT 653-654; RT 1053-1054.)

4.  Doe 2 testified that she got into Petitioner's car voluntarily when they left Fairfield.  But even assuming she was motivated by fear, there was no evidence that he used physical force of any kind to get her into the car.  He did not grab her, or drag her, or push her into the car.  He did not, in fact, lay a finger on her.  He merely told her, "Let's go."  (RT 127.)  Petitioner then drove the car back to San Francisco.  He stopped at a tollbooth.  Doe did not try to get out of the car or ask the toll-keeper for help.  From the toll booth they drove to Twin Peaks and then to Bernal Heights, and at no time during this driving did petitioner use physical force or physical restraint in any way.  Under the circumstances of this case, no rational trier of fact could have found the element of physical force as required for the kidnapping enhancement (*Jackson* v. *Virginia*, 443 U.S. 307, 319 (1979)), and these enhancements cannot be sustained under the United States Constitution.

**C.  The finding of one-strike kidnapping enhancements in connection with counts 17 and 18 were also in violation of the Due Process Clause of the Fourteenth Amendment because of insufficient evidence that the movement of Doe 2 substantially increased the risk of harm to her.**

1.  The kidnapping for a one-strike enhancement requires, in addition to the elements of the underlying crime of kidnapping, the additional requirement that "the movement of the victim substantially increased the risk of harm to the victim over and above the level of risk necessarily inherent in the underlying offense. . . ." (§ 667.61(d)(2).)

2.  In the instant case, Doe 2 testified that Petitioner moved her from the seclusion of his house in Fairfield to two very public places:  a parking lot in Twin Peaks and residential neighborhood in Bernal Heights.  This represented a substantial *decrease* in the risk of harm to the victim rather than an increase, and the prosecution introduced no further evidence of the nature of the surroundings in Twin Peaks or Bernal Heights to contradict this.  In short, no rational trier of fact could have concluded there was a substantial increase in harm in the movement from Fairfield to San Francisco. (*Jackson* v. *Virginia*, *supra*, 443 U.S. at p. 319.)  The finding of the one-strike enhancement for counts 17 and 18 therefore violates the Due Process Clause of the Fourteenth Amendment.  (*Apprendi* v. *New Jersey*, *supra*, 530 U.S. 466.)

**D.  Petitioner's conviction for aggravated kidnapping to commit oral copulation, as charged in count 6, is in violation of the Due Process Clause of the Fourteenth Amendment because of insufficient evidence that the movement of Doe 1 substantially increased the risk of harm to her.**

1.  Like the one-strike enhancement, kidnapping to commit oral copulation (§ 209(b)(1)), which was the crime charged in count 6, requires that the movement entail a substantial increase in the risk of harm to the victim over and above that necessarily present in the offense. (*People* v. *Rayford*, 9 Cal.4th 1, 12 (1994); *People* v. *Daniels*, 71 Cal.2nd 1119 (1969).)

2.  In the instant case, Doe 1 testified that she voluntarily got in Petitioner's car. (RT 376, 439.)  They drove around for an hour, smoking marijuana and snorting cocaine.  (RT 379-381.)  He then took her to a motel in Daly City.  While she was undressed in the bathroom, Petitioner came in and rubbed his penis against her.  She told the police he had her orally copulate him, although at trial she could not remember either the act of oral copulation or telling the police about it.  (RT 398.)  The three then left the hotel and drove to Diamond Heights in San Francisco.  Petitioner parked the car in Diamond Heights and had her orally copulate him.  (RT 405, 409-410.)

3.  The movement from a sequestered place to a public place, without any further evidence as to the specific nature of that public place, again *decreased* the risk of harm, and no rational trier of fact could have concluded otherwise.  (*Jackson* v. *Virginia*, *supra*, 443 U.S. at p. 319.)  Petitioner's conviction under count 6 constitutes a violation of the Due Process Clause of the Fourteenth Amendment.  (*In re Winship*, *supra*, 397 U.S. at pp. 362-364.)

## VI.

1.  All claims for relief presented in this petition have been presented both to the California Court of Appeal and to the California Supreme Court, and all state remedies have been exhausted.  No other petition or appeal is currently pending in any court in regard to the judgment of conviction now under attack.

2.  However, if this Court deems that any claim for relief presented in this petition has not been exhausted, Petitioner would request that proceedings in this Court be stayed and held in abeyance pending Petitioner's seeking of relief in the California Supreme Court for any unexhausted claim.

**Wherefore,** petitioner prays that this Court grant him the relief to which he may be entitled in this proceeding, and if to do so, proceedings must be stayed and held in abeyance pending state exhaustion of any unexhausted claim, petitioner would request that this also be granted.

Dated:  June 2, 2008

Respectfully submitted,

_____
Mark D. Greenberg
Attorney for Petitioner

**VERFICATION**

I, Mark D. Greenberg, declare:

I am attorney for petitioner in the above-titled action.  I have read the foregoing allegations contained in this petition for a writ of habeas corpus.  These allegations and representations are, of my knowledge true and correct.  My offices are in Alameda County; consequently, I am making this verification in place of petitioner because petitioner is incarcerated outside of Alameda County at California State Prison, Corcoran, and for that reason cannot personally make this verification.

I declare under penalty of perjury that this declaration is true and correct and was executed on June 2, 2008 at Oakland, California.

_____
Mark D. Greenberg
Attorney for Petitioner